UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| CRUM & FORSTER SPECIALTY INSURANCE COMPANY; HOMESITE INSURANCE COMPANY<br><br>Plaintiffs,<br><br>v.<br><br>NAVIGATORS SPECIALTY INSURANCE COMPANY,<br><br>Defendant. | Case No.  25-cv-09734-JSC<br><br>**ORDER RE: MOTION TO DISMISS**<br><br>Re: Dkt. No. 14 |

This insurance coverage dispute arises out of a consolidated state court construction defect action which settled for $11 million in June 2025.  All parties insured Design Line Construction, Inc. ("DLC"), the general contractor, for the project.  Plaintiffs, as excess liability insurers, allege Defendant, a primary and excess liability insurer, failed to indemnify DLC for its settlement payment.  (Dkt. No. 1.)[1]  Defendant paid $1 million towards the settlement, while Plaintiffs each paid $5 million.  Plaintiffs seek a declaratory judgment stating Defendant had a duty to indemnify DLC for its settlement payment and bring claims for equitable subrogation, contribution, and indemnity.  Pending before the Court is Defendant's motion to dismiss Plaintiffs' complaints.[2]

Having carefully considered the parties' briefing, and having had the benefit of oral argument on February 26, 2026, the Court GRANTS Defendant's motion, with leave to amend. Drawing all inferences in Plaintiffs' favor, Defendant has met its burden to show the complaints in the underlying lawsuit and the settlement agreement do not plausibly suggest Defendant had a

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.
[2] Plaintiffs initially brought two separate suits against Defendant, which the Court consolidated. (Dkt. No. 22.)  The parties agree the motion now applies to both complaints, which are substantively identical.

duty to indemnify DLC in the state court lawsuit because exclusion j(5) precludes coverage for the alleged property damage that occurred during the policy period.

**BACKGROUND**

**A.  The Construction Project and the Underlying Suit**

The underlying lawsuit arises out of a construction project.  Tibidabo, LLC ("Tibidabo") retained Hughes and Co. Construction, Inc. ("Hughes") as the original general contractor for the construction project, then terminated Hughes for various defects.  (*Id.* ¶¶ 8, 9.)  On April 24, 2019, Tibidabo retained DLC to complete the construction project and remediate defects left by Hughes.  (*Id.*)  DLC completed construction on the home on September 30, 2021, and a Certificate of Substantial Completion was filed on October 29, 2021.  (*Id.* ¶ 11.)

Over time, various state court lawsuits were filed.  On June 25, 2020, Tibidabo sued Hughes in state court, alleging on June 6, 2019 it discovered defects which required remediation.  (*Id.* ¶ 10; *see* Dkt. No. 1-1 ¶ 11.)  The alleged defects included problems with the "ceiling," "windows," "exterior and interior doors," "waterproofing," and stair beams.  (Dkt. No. 1-1 ¶ 12.)  Nearly two years later, DLC sued Tibidabo for breach of contract and the parties proceeded to arbitration.  (Dkt. No. 1 ¶ 14; Dkt. No. 1-2.)

In that arbitration Tibidabo counterclaimed, requesting $10 million in damages "arising from DLC's faulty construction work[.]"  (Dkt. No. 1-3 at 10.)  The counterclaim alleges the defects were "headlined by the required replacement of all windows and doors," but Tibidabo alleged several other defects, including:

> [e]xcessive water intrusions from faulty window (of which there are nearly 100) and door installations, which cover nearly eighty percent of the exterior of the home, faulty roof and roofing metal work, a failing HVAC system, extensive wood flooring defects, failing shower structures, faulty shade pockets, plaster and ceiling work, electrical issues, and wine room defects, to name a handful, along with an ongoing list of hundreds of interior and exterior repairs, all constitute reasonable and necessary repair work[.] […]
>
> The excessive water intrusions from obvious faulty window installations throughout the residence caused dangerous mold growth requiring immediate remedial work for basic health and safety purposes. The owner family all reported feeling ill, which is part of what triggered investigating the presence of toxic mold. […]

United States District Court
Northern District of California

> Construction defects at the Project in areas where DLC performed work, labor, or provided other materials and services include but are not limited to windows and doors including thresholds, exterior siding and fascia, exterior decks, exterior spa, garage and garage door, exterior walkways, concrete, stucco, wood framing, waterproofing, railings, mechanical, electrical and plumbing, interior wood flooring, interior plaster work, ceilings, shower structures and tiling, […] other miscellaneous issues including the presence of toxic mold[, …] drywall and insulation defects[,] and roofing work and roofing metal work defects.

(*Id.* at 11-16.) Two other parties, Omnistone Masonry, Inc. and Architectural Metal, Inc., also brought claims against DLC. (Dkt. No. 1 ¶¶ 16-17.) All claims were consolidated in March 2025. (*Id.* ¶ 18.)

"On or about June 24, 2025, the claims asserted against DLC in the Consolidated Action were settled for $11,000,000." (*Id.* ¶ 62; *see also* Dkt. No. 1-13 (settlement agreement).) Defendant paid $1 million towards the settlement. (Dkt. No. 1 ¶ 67.)[3] "Because [Defendant's] offer … purported to exhaust [its] policy, … Plaintiff offered to contribute $5 million limit under [its] excess policy[.]" (*Id.* ¶ 61.) Plaintiffs each paid $5 million, subject to a reservation of rights. (*Id.* ¶¶ 62.)

## B. Navigators' Insurance Policies

At issue is a Commercial General Liability Insurance policy Defendant issued to DLC: policy no. CE19CGL21559IC, effective April 1, 2019 to April 1, 2020. (*Id.* ¶¶ 28-30.) Under the policy, Defendant is "legally obligated to pay as damages because of … 'property damage' to which this insurance applies." (*Id.* ¶ 21.) The Policy applies only if "the property damage is caused by an occurrence," *and* the "property damages occurs during the policy period." (*Id.* ¶ 21(b) (internal quotation marks omitted).) "'Property damage' means[] physical injury to tangible property, including all resulting loss of use to that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it[.]" (*Id.* ¶ 23; Dkt. No. 1-6 at 33.)

---

[3] Defendant contends "while Navigators agreed to contribute to the settlement in the Consolidated Action under the 21-22 Navigators Primary Policy, Navigators had no obligation to defend or indemnify DLC under the 20-21, 21-22, or 22-23 Navigators Primary Policies because the CONTINUOUS AND PROGRESSIVE INJURY AND DAMAGE EXCLUSION precludes coverage." (Dkt. No. 14-1 at 12.) Defendant then cites to a footnote saying "in the event that this lawsuit survives the instant motion, Navigators may pursue a counterclaim for declaratory relief that it had no coverage obligation to DLC under any of the Navigators Policies." (*Id.* at 12 n.2.) In other words, Defendant contends it was not required to pay $1 million towards the settlement.

The motion to dismiss centers on two exclusions of coverage.  Coverage is excluded for property damage to:

> (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; [and]

> (6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

(Dkt. No. 1-6 at 22.)  These exclusions are known as j(5) and j(6).

### C.  Plaintiffs' Claims

Plaintiffs "contend[] that the duty to indemnify DLC arose under Navigators primary policy no. CE19GCL21559IC and the Navigators Excess Policy, but Navigators unreasonably failed and refused to contribute anything other than one per occurrence limit of $1,000,000" under the primary policy.  (Dkt. No. 1 ¶ 60.)  In particular, they allege Defendant had a duty to indemnify DLC under the primary and excess policies effective April 1, 2019 to April 1, 2020. (*Id.* ¶¶ 29, 66, 86.)   Based on the alleged failure to indemnify, Plaintiffs bring four causes of action: (1) equitable subrogation, (2) equitable contribution, (3) equitable indemnity, and (4) declaratory relief.  (*Id.* ¶¶ 65-91.)  The declaratory relief claim "requests a judicial declaration that Navigators had a duty to indemnify DLC" under the 2019-2020 policy and, by extension, the excess policy.  (*Id.* ¶ 90.)

### DISCUSSION

Defendant moves to dismiss Plaintiffs' complaints for failure to state a claim on the grounds it had no duty to indemnify DLC under exclusion j(5) of its primary policy.[4]

### I.    Plaintiffs Plausibly Allege the 2019-2020 Policy Provides Coverage

The underlying consolidated complaints allege property damage arising from DLC's work on the project.  (Dkt. No. 1-3 at 10, 11-16.)  And, Plaintiffs allege DLC was the project's general contractor from April 24, 2019 through at least 2021.  (*See, e.g.*, Dkt. No. 1 ¶ 6 (Navigators'

---

[4] Defendant's motion rested on exclusions j(5) and j(6), but Defendant's reply stated "[t]he authorities applying j.(5) to general contractors actually render any argument under j.(6) moot[.]" (Dkt. No. 27 at 1.)

United States District Court
Northern District of California

primary policy was effective April 1, 2019 to April 1, 2020); ¶¶ 8, 9, 11 (Plaintiffs allege DLC was retained on April 23, 2019 and construction was completed on September 30, 2021); Dkt. No. 1-2 ¶ 6 (complaint alleging "DLC served as the General Contractor on the Project pursuant to the Contract.")  So, while the complaint in this action, the underlying complaints, and the settlement agreement do not precisely allege when the property damage occurred, drawing all reasonable inferences in Plaintiffs' favor, at least some of the damage for which Plaintiffs paid $10 million in settlement occurred during the April 2019-2020 policy period.  Plaintiffs thus plausibly allege at least some of the amounts paid in settlement are within the scope of the policy's coverage.  *See MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 648 (2003) (holding that under California law, "[t]he burden is on the insured to establish that the claim is within the basic scope of coverage").

## II.    The j(5) Exclusion Applies as a Matter of Law

For purposes of its motion to dismiss, Navigators assumes Plaintiffs have sufficiently alleged the settlement paid for damages, at least in part, that occurred during the 2019-2020 policy period.  It nonetheless contends it had no duty to indemnify DLC under its 2019-2020 policy because exclusion j(5) precludes coverage as a matter of law.  Navigators bears the burden to establish that Plaintiffs' claims are specifically excluded.  *Id.*

Navigators argues any covered property damage that occurred during the 2019-2020 policy period must have occurred to "[t]hat particular part of real property on which" DLC or its subcontractors were "performing operations" with the property damage "aris[ing] out of those operations" and therefore exclusion j(5) applies.  (Dkt. No. 14-1 at 16 (quoting Dkt. No. 1 ¶ 19).)

Whether a policy exclusion applies is a question of contract interpretation governed by California law.  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  While courts "generally interpret the coverage clauses of insurance policies broadly, protecting the objectively reasonable expectations of the insured," policy exclusions are generally "interpretated narrowly against the insurer."  *AIU Ins. Co. v. Sup. Ct.*, 51 Cal. 3d 807, 822 (1990).  So, here, Defendant must show, drawing all inferences in Plaintiffs' favor, the alleged property damage during the 2019-2020 policy period was to "the particular part" of property on which DLC was operating and the property damage "arises out of" those operations.

**A. "That particular part" on which DLC was performing operations**

When exclusion j(5) is applied to the work of a general contractor, "California courts have consistently adopted broad interpretations of the phrases 'that particular part' and 'arises out of[.]'" *Archer W. Contractors, Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania*, 680 F. App'x 604, 606 (9th Cir. 2017). In particular, for purposes of exclusion j(5), "[i]n the case of a general contractor, all the work at the project is considered its work product, whereas in the case of a subcontractor, . . . only its portion of the work, such as siding, is the work product and damage to other parts of the project is considered damage to other property." *See George F. Hillenbrand, Inc. v. Ins. Co. of N. Am.*, 104 Cal. App. 4th 784, 793–94, 805 (2002); *see also Archer W. Contractors, Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania,* 680 F. App'x 604, 606 (9th Cir. 2017) ("California courts have construed 'that particular part' to encompass the entire project on which a general contractor is performing operations."). As the California Court of Appeals has explained about exclusion j(5):

> Generally liability policies ... are not designed to provide contractors ... with coverage against claims their work is inferior or defective[.] The risk of replacing and repairing defective materials or poor workmanship has generally been considered a commercial risk which is not passed on to the liability insurer. Rather liability coverage comes into play when the insured's defective materials or work cause injury to property other than the insured's own work or products. In other words, the contractor bears the risk of repairing or replacing faulty workmanship, while the insurer bears the risk of damage to the property of others. […]
>
> Exclusions j(5) and (6) show that the parties to the … policy intended that [the general contractor] bear the risks of faulty workmanship or defective materials.
>
> The exclusion found in j(5) applies to works in progress. The insurer is not obligated to indemnify a policyholder for property damage that occurs while the insured is performing operations on that property. ***Thus, if the … claims encompassed property damage that occurred while [the general contractor] or its subcontractors were performing operations on the property, no coverage would exist.***

*Clarendon Am. Ins. Co. v. Gen. Sec. Indem. Co. of Arizona*, 193 Cal. App. 4th 1311, 1325–26 (2011) (emphasis added) (cleaned up).

Here, drawing all reasonable inferences in Plaintiffs' favor, Defendant has met its burden

United States District Court
Northern District of California

of showing the "covered" property damage was to "that particular part" of the property DLC was performing operations.  It is undisputed DLC was the project's general contractor during the policy period.  (*See, e.g.*, Dkt. No. 1 ¶ 6 (Navigators' primary policy was effective April 1, 2019 to April 1, 2020); ¶¶ 8, 9, 11 (Plaintiffs allege DLC was retained on April 23, 2019 and construction was completed on September 30, 2021); Dkt. No. 1-2 ¶ 6 (complaint alleging "DLC served as the General Contractor on the Project pursuant to the Contract.")  So, "that particular part of real property on which [DLC was] … performing operations" includes "all work at the project," including the work of subcontractors.  *Hillenbrand*, 104 Cal. App. 4th at 804; *Archer*, 680 F. App'x at 606.

Plaintiffs' arguments to the contrary are unavailing.  Plaintiffs rely on *Global Modular, Inc. v. Kadena Pacific, Inc.*, 15 Cal. App. 5th 127, 138 (2017), where a general contractor (Kadena) sued a subcontractor (Global) over water damage caused by heavy rains.  *Id.* at 131–138.  The court held exclusion j(5), "by its terms, … applies only to damage to the particular part of real property on which Global was performing operations at the time of damage."  *Id.* at 137.  But as Global was a subcontractor, the court's holding does not dispute the well-established California law that for an insured general contractor, "the particular part" applies to the entire project.  Plaintiffs also rely on *Global* to hold that exclusion j(5) does not apply to damage that occurred when DLC was not performing operations.  *See id.* (concluding "the use of the active, present tense construction 'are performing operations' indicates the exclusion applies only to damage *caused during physical construction activities*," as opposed to water intrusions that "occurred during heavy rains when [the subcontractor] was not working on the units.") (emphasis added).  Plaintiffs then contend here water intrusions and "[d]amage to the home's interior … did not occur while" DLC's construction work was occurring.  (Dkt. No. 20 at 4-5.)  But, if the damage occurred after DLC was no longer the general contractor, and thus no longer performing operations, then the damage did not occur during the policy period and there is no coverage to exclude.

At oral argument, Plaintiffs urged the Court to not follow *Hillenbrand* because (1) it was a malicious prosecution case, so its reasoning about general contractors is dicta; (2) it was wrongly

decided because it relied on two cases interpreting different language; (3) it is "outdated" due to *Global Modular*; and (4) *Hillenbrand*'s approach was rejected in *Pulte Home Corp. v. Am. Safety. Indem. Co.*, 14 Cal. App. 5th 1086, 1117 (2017).  When interpreting state law, federal courts are bound by decisions of the state's highest court." *Arizona Elec. Power Co-op., Inc. v. Berkeley*, 59 F.3d 988, 991 (9th Cir. 1995).  "In the absence of such a decision, a federal court must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." *In re Kirkland*, 915 F.2d 1236, 1239 (9th Cir. 1990).  "In the absence of convincing evidence that the highest court of the state would decide differently, a federal court is obligated to follow the decisions of the state's intermediate courts." *Id.* (cleaned up); *see also Curtis v. Irwin Indus., Inc.*, 913 F.3d 1146, 1155 (9th Cir. 2019) (holding federal courts "are bound to follow the rulings of intermediate state courts absent convincing evidence that the California Supreme Court would reject th[ose] interpretation[s]").

The Court is not convinced the California Supreme Court would reject *Hillenbrand*'s holding distinguishing between the work of general contractors and subcontractors.  As to Plaintiffs' first criticism, *Hillenbrand*'s reasoning was not dicta.  *Hillenbrand*'s malicious prosecution inquiry was whether there was probable cause for an insurer to assert, in a declaratory relief claim, it had no duty to defend an insured under an exclusion containing the words "that particular part of any property." *See* 104 Cal. App. 4th at 793–94, 800–04.  As part of that inquiry, the court examined the relevant case law and concluded a general contractor's work includes all work performed in a project. *Id.* at 805.  Regarding Plaintiffs' second criticism, although *Hillenbrand* relied on cases interpreting different language, *Hillenbrand* is still persuasive because it interpreted "that particular part" and the language in its cited cases were previous versions of the work-product exclusion in general liability insurance policies. *See id.* (citing the two following cases: *Western Employers Ins. Co. v. Arciero & Sons, Inc.*, 146 Cal. App. 3d 1027 (1983); *Maryland Casualty Co. v. Reeder*, 221 Cal. App. 3d 961 (1990)).  Additionally, the interpretations of exclusions in all three cases are consistent with the purpose of liability policies in construction cases: contractors, not insurers, should bear the risk of repairing

and replacing defective work.  And since *Hillenbrand*, the California Courts of Appeal continue to interpret exclusion j(5) in line with that purpose. *See, e.g.*, *Clarendon*, 193 Cal. App. 4th at 1325–26.

As for Plaintiffs' third and fourth criticisms, neither *Global* nor *Pulte* rejected *Hillenbrand*'s approach.  *Global* did not reject *Hillenbrand*, and its interpretation of "that particular part" as applied to the work of subcontractors is consistent with *Hillenbrand's* holding "contrast[ing]" the work of general contractors and subcontractors.  *See* 104 Cal. App. 4th at 800–04.  Similarly, *Pulte* did not hold *Hillenbrand* was incorrectly decided; rather, *Pulte*, a duty to defend case involving policies issued to subcontractors, held *Hillenbrand*'s "approach disregards the pleaded facts in [*Pulte*'s] underlying complaints, that some of the numerous subcontractors' work was allegedly defective and therefore caused problems with other interrelated and adjacent construction work at the projects."  14 Cal. App. 5th at 1104, 1117.  Like *Global*, this analysis is consistent with *Hillenbrand*'s reasoning, namely courts must "contrast" the work of a general contractors and subcontractors.  *See* 104 Cal. App. 4th at 800–04.  In other words, *Global* and *Pulte* do not provide "convincing evidence" the California Supreme Court would interpret "that particular part" as applied to general contractors differently than *Hillenbrand*.  Further, the Ninth Circuit has noted "California courts have construed 'that particular part' to encompass the entire project on which a general contractor is performing operations," *Archer Western Contractors, Ltd.*, 680 Fed. Appx. at 606, and that "[f]ederal courts interpreting identical exclusions under California law are in accord."  *Id.* (citing cases).  So, this Court "is obligated to follow" *Hillenbrand.  See Kirkland*, 915 F.2d at 1239.

## B.  "Arises out of" DLC's operations

Plaintiffs appear to obliquely assert j(5) does not apply because the alleged property damage that occurred during the 2019-2020 policy period did not, as a matter of undisputed fact, "arise out of" DLC's performance of its operations.

> As used in various types of insurance provisions, the term "arising out of" links a factual situation with the event creating liability and does not import any particular standard of causation or theory of liability into an insurance policy.  Rather, "[a]rising out of" are words of much broader significance than "caused by."  They are ordinarily

United States District Court
Northern District of California

understood to mean "originating from[,]" "having its origin in," "growing out of" or "flowing from" or in short, "incident to, or having connection with[.]"

*Davis v. Farmers Ins. Grp.*, 134 Cal. App. 4th 100, 106–107 (2005).  Accordingly, exclusion j(5) applies if the property damage "arises out of," meaning it "flow[s] from," is "incident to," or has a "connection with" DLC's work.  *See Davis*, 134 Cal. App. 4th at 106–107.  Drawing all inferences in Plaintiffs' favor, Defendant has met its burden of showing the property damage's "connection with" the project.  (*See, e.g.*, Dkt. No. 1-1 ¶ 11 (complaint alleges DLC was hired "to remediate defective construction work" performed by Hughes); Dkt. No. 1-3 at 10-11 (counterclaim against DLC alleges $10 million in damages because DLC "fail[ed] to timely, or in any manner, complete and/or correct such incomplete work, defective work, and faulty craftmanship"), *id.* at 15-16 ("Construction defects at the Project in areas where DLC performed work … include but are not limited to … windows and doors including … exterior walkways, … waterproofing, … interior wood flooring, … and other miscellaneous issues including the presence of toxic mold.")) Plaintiffs do not identify any allegations that support an inference property damage that occurred during the policy period did not "arise out of" DLC's operations given that, under California law, DLC, as a general contractor, is responsible for all operations at the project, regardless of whether DLC physically performed the operations itself.

***

Defendant has met its burden of showing that, drawing all reasonable inferences from the allegations in the complaints in this action, the underlying complaints, and the settlement agreement, any property damage that occurred during the 2019-2020 policy period falls within exclusion j(5).  So, Defendant's motion to dismiss must be granted.

### III. Leave to Amend

Plaintiffs request leave to amend, suggesting they can allege facts in support of two new claims, one based on the "rule of vertical exhaustion" and another based on Defendant's "failure to fund the settlement" under the theory Defendant "breached its duty to settle.  (Dkt. No. 20 at 4-5, 7) (citing *Truck Ins. Exch. v. Kaiser Cement and Gypsum Corp.*, 16 Cal. 5th 67, 99-100 (2024) and *Montrose Chemical Corp. v. Sup. Ct.*, 9 Cal. 5th 215, 237 (2020))); *see also Archdale v. Am.*

10

*Internat. Specialty Lines Ins. Co.*, 154 Cal. App. 4th 449, 464 (2007) ("The implied covenant of good faith and fair dealing imposes a duty on an insurer to accept a reasonable offer to settle a claim against its insured.")  Defendant's reply did not address these proposed claims in reply. Given the Court cannot conclude at this stage and on this record Plaintiffs' proposed claims would fail as a matter of law, dismissal is with leave to amend.

**CONCLUSION**

For the reasons set forth above, the Court grants Defendant's motion to dismiss, with leave to amend.  Plaintiffs' amended complaint, if any, must be filed by March 26, 2026.  If Plaintiffs elect not to file an amended complaint, judgment will be entered.

This Order disposes of Docket No. 14.

**IT IS SO ORDERED.**

Dated: March 6, 2026

JACQUELINE SCOTT CORLEY
United States District Judge

United States District Court
Northern District of California

11