UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| CRUM & FORSTER SPECIALTY INSURANCE COMPANY; HOMESITE INSURANCE COMPANY | Case No.  25-cv-09734-JSC |
| Plaintiffs, | **ORDER RE: MOTIONS TO DISMISS FIRST AMENDED COMPLAINTS** |
| v. | Re: Dkt. Nos. 39, 40 |
| NAVIGATORS SPECIALTY INSURANCE COMPANY, | |
| Defendant. | |

This insurance coverage dispute arises out of a consolidated home construction defect action which settled for $11 million in June 2025.  All parties insured Design Line Construction, Inc. ("DLC"), the general contractor.  Plaintiffs, as excess liability insurers, allege Defendant, a primary and excess liability insurer, failed to indemnify DLC for its settlement payment.  (Dkt. Nos. 36, 37.)[1]  Defendant paid $1 million towards the settlement, while Plaintiffs each paid $5 million.  Plaintiffs seek a declaratory judgment stating Defendant had a duty to indemnify DLC for the settlement payment under its April 2019 to April 2020 primary and excess policies.  They also bring claims for equitable subrogation, contribution, indemnity, as well as a subrogation claim for breach of the duty of good faith and fair dealing.

Pending before the Court are Defendant's motions to dismiss Plaintiffs' First Amended Complaints.[2]  (Dkt. Nos. 39, 40.)  Having carefully considered the parties' briefing, and having

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

[2] Plaintiffs initially brought two separate suits against Defendant, which the Court consolidated. (Dkt. No. 22.)  After the Court granted the motion to dismiss the original complaints, Plaintiffs again filed separate complaints rather than a single consolidated complaint. (Dkt. Nos. 36, 37.)  At oral argument, Plaintiffs confirmed there is no material difference between the allegations of their First Amended Complaints.  For simplicity, this Order will cite to the Crum & Forster First

had the benefit of oral argument on May 21, 2026, the Court GRANTS Defendant's motions, without leave to amend.  Drawing all inferences in Plaintiffs' favor, Plaintiffs have not—and cannot—meet their burden of alleging facts that plausibly support an inference any payments made for the original general contractor's defective work during the policy period are for property damage covered by Defendant's policies.

## BACKGROUND

### A.  The Construction Project and the Underlying Suit

The underlying lawsuit arises out of a home construction project.  Tibidabo, LLC ("Tibidabo") retained Hughes and Co. Construction, Inc. ("Hughes") as the original general contractor for the construction project, then terminated Hughes around April 24, 2019 for various defects, including in the installation of doors and windows.  (Dkt. No. 37 ¶¶ 8-14.)  On April 24, 2019, Tibidabo retained DLC to complete the construction project and remediate defects left by Hughes.[3]  (Id. ¶ 16.)  DLC completed construction on the home on September 30, 2021, and a Certificate of Substantial Completion was filed on October 29, 2021.  (Id. ¶ 24.)

Over time, various state court lawsuits were filed.  On June 25, 2020, Tibidabo sued Hughes in state court, alleging on June 6, 2019 it discovered defects which required remediation.  (Id. ¶ 22.)  The alleged defects included problems with the "ceilings," "windows," "exterior and interior doors," "waterproofing," and stair beams.  (Id. ¶ 22.)  Hughes then filed a cross-complaint against DLC "alleging that DLC's negligence caused damage to work performed by Hughes and/or its subcontractors."  (Id. ¶ 23.)  Nearly two years later, DLC sued Tibidabo for breach of contract and the parties proceeded to arbitration.  (Id. ¶ 27.)  In that arbitration Tibidabo counterclaimed against DLC "alleging multiple defects in the construction of the Project, including but not limited to, defects in the installation and waterproofing of the windows and exterior doors."  (Id.)  Two other parties, Omnistone Masonry, Inc. and Architectural Metal, Inc.,

Amended Complaint.
[3] Homesite's First Amended Complaint attached an incomplete version of the April 24, 2019 contract between Tibidabo and DLC.  (Dkt. No. 41 at 3.)  The Court therefore grants Homesite's stipulated administrative motion to correct the record and substitute that version of the contract with an accurate version.  (Dkt. No. 41.)

also brought claims against DLC. (*Id.* ¶¶ 29-30.) All the lawsuits were consolidated in March 2025. (*Id.* ¶ 31.)

"On or about June 24, 2025, the claims asserted against DLC in the Consolidated Action were settled for $11,000,000." (*Id.* ¶ 79; *see also* Dkt. No. 37-15 (settlement agreement).) Defendant paid $1 million towards the settlement. (Dkt. No. 37-15 at 4.) "Because [Defendant's] offer … purported to exhaust [its] policy, … Plaintiff[s] offered to contribute $5 million limit under [their] excess policy[.]" (Dkt. No. 37 ¶ 78.) Plaintiffs each paid $5 million, subject to a reservation of rights. (*Id.* ¶ 79.)

### B. New FAC Allegations

Shortly after Tibidabo terminated Hughes as general contractor and hired DLC, "Tibidabo and/or DLC discovered additional defects in work performed by Hughes and/or its subcontractors and resulting damage to the Project requiring extensive remediation." (*Id.* ¶ 17.) "[I]n late 2019 and early 2020," DLC removed and replaced some of the windows and doors Hughes had installed. (*Id.* ¶ 19.) Separately, "on June 6, 2019, Tibidabo entered into a second construction contract with Hughes to resolve various disputes about Hughes' work on the Project." (*Id.* ¶ 18). Pursuant to this second contract, "Hughes performed remedial work" which was "independent of" work DLC performed between June 6, 2019 and April 1, 2020. (*Id.*) Hughes' remedial work was "defective" and "led to water intrusion that damaged the Project," so in January 2020, DLC "removed and replaced" material Hughes had damaged. (*Id.* ¶ 20.)

In addition, DLC and Hughes each caused damage to the Project during the April 1, 2019–April 1, 2020 policy period. During the policy period, "DLC allegedly damaged Hughes' work, including completed work below the windows," and Hughes' "[d]efective work" during the period "also caused extensive damage[. …] For example, the improper installation of windows and doors at the Project caused […] water intrusion that resulted in extensive damage to the Project. (*Id.* ¶ 21.)

Finally, Plaintiffs bring a new "claim in subrogation for breach of the implied covenant of good faith and fair dealing." (*Id.* ¶¶ 110-125.) Plaintiffs reiterate "Navigators had a duty to indemnify DLC" and "an opportunity arose to resolve the claims asserted against DLC" "[i]n

3

March 2025," but Navigators "unreasonably failed and refused to" indemnify DLC or settle the claims against DLC. (*Id.* ¶¶ 111-114.) "Navigators' refusal to settle was unreasonable, wrongful, in violation of its obligations under California law and in violation of the implied covenant of good faith and fair dealing, thereby causing" Plaintiffs to pay $5 million towards the settlement. (*Id.* ¶ 125.)

### C. Navigators' Insurance Policies

At issue is a Commercial General Liability Insurance Policy Navigators issued to DLC: policy no. CE19CGL21559IC, effective April 1, 2019 to April 1, 2020. (*Id.* ¶ 32.) Under the Policy, Navigators agrees to provide liability insurance coverage for "those sums that the insured becomes legally obligated to pay as damages because of … 'property damage' to which this insurance applies." (*Id.* ¶ 34(a).) The Policy applies only if "the property damage is caused by an occurrence," *and* the "property damages occurs during the policy period." (*Id.* ¶ 34(b) (internal quotation marks omitted).) "'Property damage' means[] physical injury to tangible property, including all resulting loss of use to that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it[.]" (Dkt. No. 37-8 at 33.)

### D. The Court's Prior Order

The Court granted Defendant's prior motions to dismiss, with leave to amend. The Order noted under California law, it is Plaintiffs' burden "'to establish that the claim is within the basic scope of coverage.'" (Dkt. No. 34 at 5 (quoting *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 648 (2003)).) So, to meet their burden to show coverage, Plaintiffs needed to allege facts supporting an inference property damage occurred at the Project during the policy period due to DLC's defective work.

The Court concluded Plaintiffs had met their burden. Defendant's motions "assume[d] Plaintiffs ha[d] sufficiently alleged the settlement paid for damages, at least in part, that occurred during the 2019-2020 policy period." (Dkt. No. 34 at 5.) Additionally, "while the complaint in this action, the underlying complaints, and the settlement agreement do not precisely allege when the property damage occurred, drawing all inferences in Plaintiffs' favor, at least some of the damage for which Plaintiffs paid $10 million in settlement occurred during the April 2019-2020

4

policy period" because "Plaintiffs allege DLC was the project's general contractor from April 24, 2019 through at least 2021." (*Id.* at 4-5.)

But even assuming property damage occurred during the policy period, Defendant argued it had no duty to indemnify DLC because exclusion j(5) precluded coverage for the alleged property damage. Exclusion j(5) precludes coverage for property damage to "that particular part of real property on which [the insured] or any contractors or subcontractors […] are performing operations, if the 'property damage' arises out of those operations[.]" (*Id.* at 4 (quoting Dkt. No. 1-6 at 22).) So, Defendant's burden was to show, drawing all inferences in Plaintiffs' favor, the alleged property damage that occurred during the policy period was (1) to "that particular part" of property on which DLC was performing operations, and (2) arose out of DLC's operations. (Dkt. No. 34 at 6-10.)

The Court ruled Defendant met its burden. First, "that particular part" applies to all work of a general contractor and its subcontractors, and drawing inferences from the underlying complaints in Plaintiffs' favor, the property damage was to parts of the property on which DLC and its subcontractors were performing operations. (*Id.* at 6-9 (citing *George F. Hillenbrand, Inc. v. Ins. Co. of N. Am.*, 104 Cal. App. 4th 784, 793–94, 805 (2002)).) Second, California courts interpret "arises out of" broadly to mean "originating from," "flowing from," "incident to, or having connection with." (Dkt. No. 34 at 9-10 (citing *Davis v. Farmers Ins. Grp.*, 134 Cal. App. 4th 100, 106–07 (2005)).) Drawing inferences in Plaintiffs' favor, the alleged property damage had a "connection with" DLC's operations on the home construction. (Dkt. No. 34 at 10 (cleaned up).) So, Defendant met its burden of showing exclusion j(5) applied as a matter of law. The Court therefore granted Defendant's motion to dismiss with leave to amend. (*Id.* at 10-11.)

## DISCUSSION

Defendant moves to dismiss Plaintiffs' FACs on the grounds Plaintiffs' complaints and their attachments establish as a matter of law Defendant had no duty to indemnify DLC under its primary and excess insurance policies. And because Defendant had no duty to indemnify DLC, Plaintiffs' good-faith-and-fair-dealing claims fail. The Court agrees.

As explained above, it is Plaintiffs' burden to establish the settlement payment falls within

United States District Court
Northern District of California

United States District Court
Northern District of California

the Policy's coverage. *See MacKinnon*, 31 Cal. 4th at 648. The Court previously concluded Defendant had shown exclusion j(5) precluded coverage for any damage caused by DLC's work. Plaintiffs now pivot and argue that in addition to damage from DLC's own work, the Policy covered damage from Hughes' work. But the FAC and its attachments do not support an inference the Policy covers damage caused by Hughes. The Policy promises to provide insurance for damages DLC—the insured—became "legally obligated to pay." (Dkt. No. 37-8 at 18.) So, to show Defendant had a duty to indemnify DLC for damage caused by Hughes work, Plaintiffs must show DLC was "legally obligated to pay" for damage caused by Hughes.

Plaintiffs' good-faith-and-fair-dealing claim also hinges on whether DLC had such an obligation.

> California courts have derived an implied duty on the part of the insurer to accept reasonable settlement demands on such claims within the policy limits. An insurer is required to act in good faith in dealing with its insured. Thus, in deciding whether or not to settle a claim, the insurer must take into account the interests of the insured, and when there is a great risk of recovery beyond the policy limits, a good faith consideration of the insured's interests may require the insurer to settle the claim within the policy limits.

*Hamilton v. Maryland Cas. Co.*, 27 Cal. 4th 718, 723–25 (2002) (cleaned up). Here, Plaintiffs assert Defendant "unreasonably failed and refused to" indemnify DLC or settle the claims against DLC. (Dkt. No. 37 ¶¶ 111-114.) But whether Defendant had a duty to indemnify or accept a settlement offer turns on whether the Policy covered the property damage at issue. *See Hamilton*, 27 Cal. 4th at 724–25 (noting the an insurer "may" be required to settle "when there is a **great risk** of recovery" under the insurer's policy) (emphasis added); *Diamond Heights Homeowners Assn. v. Nat'l Am. Ins. Co.*, 227 Cal. App. 3d 564, 578–79 (1991) ("[I]n evaluating settlement of a claim where the insured and insurer **may both** incur liability, each assumes an obligation to act in good faith, to **face the facts realistically**, and to maintain a mutual respect for the interests of the other.") (emphasis added); *id.* at 579 (noting "[w]here there is excess coverage," the primary insurer "must conduct the defense of the litigation, including settlement negotiations, so as to not expose the excess insurer to **unwarranted** liabilities. An excess insurer may therefore recover against the primary insurer when, for example, the latter **wrongfully** refuses to accept a settlement

6

offer within primary policy limits, where, prior to trial, there was a **substantially likelihood of recovery** in excess of those limits.")  So, all of Plaintiffs' claims rest on whether DLC was legally obligated to pay for damages caused by Hughes' work.

Plaintiffs' opposition posits two theories as to why DLC had such an obligation: a contract and tort.  Drawing inferences in Plaintiffs' favor, Plaintiffs have not alleged facts sufficient under either theory to support an inference DLC was required to pay for damages caused by Hughes' work.

### A.  Section 6.2.2 of Tibidabo's and DLC's Contract

Plaintiffs argue the April 24, 2019 contract between Tibidabo and DLC requires DLC to pay for damage caused by Hughes' work.  Plaintiffs rely exclusively on Section 6.2.2, which states:

> § 6.2 Mutual Responsibility
>
> […]
>
> § 6.2.2 If part of the Contractor's Work depends for proper execution or results upon construction or operations by the Owner or a Separate Contractor, the Contractor shall, prior to proceeding with that portion of the Work, promptly notify the Architect of apparent discrepancies or defects in the construction or operations by the Owner or Separate Contractor that would render it unsuitable for proper execution and results of the Contractor's Work. Failure of the Contractor to notify the Architect of apparent discrepancies or defects prior to proceeding with the Work shall constitute an acknowledgment that the Owner's or Separate Contractor's completed or partially completed construction is fit and proper to receive the Contractor's Work. The Contractor shall not be responsible for discrepancies or defects in the construction or operations by the Owner or Separate Contractor that are not apparent.

(Dkt. No. 37-5 at 74.)  Under the contract, DLC is "the Contractor" and Hughes is the "Separate Contractor" because Hughes and Tibidabo entered a contract on June 6, 2019 for Hughes to provide remedial work.  So, Plaintiffs' argument goes, because Section 6.2.2 "required DLC to give notice of all apparent discrepancies or defects in work performed by" Hughes, "DLC was allegedly liable for all apparent discrepancies and defects in Hughes'[] work and resulting 'property damage.'"  (Dkt. No. 45 at 7-8.)

Under California law, courts interpret insurance policies based on "the written provisions of the contract."  *AIU Ins. Co. v. Sup. Ct.*, 51 Cal. 3d 807, 822 (1990) (citing Cal. Civ. Code §§

7

1636, 1639).  Courts "first consider the coverage language of the policy," *MacKinnon*, 31 Cal. 4th at 649, and "interpret the coverage clauses of insurance policies broadly, protecting the objectively reasonable expectations of the insured." *AIU Ins.*, 51 Cal. 3d at 822.  So, to show coverage here, Plaintiffs must show, drawing all reasonable inferences in their favor, DLC was legally obligated to pay for damages caused by Hughes' work pursuant to "the written provisions of" the contract between Tibidabo and DLC.  *Id.*; *see MacKinnon*, 31 Cal. 4th at 648.

Drawing all inferences in Plaintiffs' favor, Plaintiffs have not established DLC could be legally obligated to pay for damage caused by Hughes.  Section 6.2.2, by its plain terms, does not obligate DLC to pay for defects caused by Hughes.  Section 6.2.2 says DLC "**shall not be responsible for**" Hughes' "discrepancies and defects […] that are not apparent." (Dkt. No. 37-5 at 74 (emphasis added).)  And when Hughes' defects are "apparent," Section 6.2.2 does not require DLC to pay damages; rather, Section 6.2.2 requires DLC to "promptly notify the Architect" and DLC's "[f]ailure" to do so merely "constitute[s] an acknowledgement" Hughes' work "is fit and proper to receive [DLC's] work." (*Id.*)  Simply put, no "written provision[]" in Section 6.2.2 contemplates an obligation for DLC to pay damages caused by Hughes' work.  *AIU Ins.*, 51 Cal. 3d at 822.

Additionally, Section 6.2.2 must be interpreted in a manner that is consistent with other provisions in the April 24, 2019 contract, and four other contract provisions similarly do not require DLC to pay damages caused by Hughes' work.  Respectively, Section 3.3.2, Section 3.5.1, Section 3.18.1, and Section 6.2.3 state:

§ 3.3 Supervision and Construction Procedures

[…]

§ 3.3.2 The Contractor shall be responsible to the Owner for acts and omissions of the Contractor's employees, Subcontractors and their agents and employees, and other persons or entities performing portions of the Work for, or on behalf of, the Contractor or any of its Subcontractors.

[…]

§ 3.5 Warranty

§ 3.5.1 The Contractor warrants to the Owner and Architect that materials and equipment furnished under the Contract will be of good quality and new

unless the Contract Documents require or permit otherwise. The Contractor further warrants that the Work will conform to the requirements of the Contract Documents and will be free from defects[. …] **The Contractor's warranty excludes remedy for damage or defect caused by abuse, alterations to the Work not executed by the Contractor** […]

§ 3.18 Indemnification

§ 3.18.1 To the fullest extent permitted by law, **the Contractor shall indemnify and hold harmless the Owner, Architect, Architect's consultants, and agents and employees of any of them from and against claims, damages**, losses, and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work, provided that such claim, damage, loss, or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself), **but only to the extent caused by the negligent acts or omissions of the Contractor, a Subcontractor, anyone directly or indirectly employed by them, or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss, or expense is caused in part by a party indemnified hereunder.** Such obligation shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity that would otherwise exist as to a party or person described in this Section 3.18.

[…]

§ 6.2.3 The Contractor shall reimburse the Owner for costs the Owner incurs that are payable to a Separate Contractor because of the Contractor's delays, improperly timed activities or defective construction. **The Owner shall be responsible to the Contractor for costs the Contractor incurs because of a Separate Contractor's delays, improperly timed activities, damage to the Work or defective construction.**

(Dkt. No. 37-5 at 66, 67, 71, 74 (emphasis added).)

All four sections identify DLC's responsibilities, and none provide DLC is legally obligated to pay for damages caused by Hughes' work. First, Section 3.3.2 identifies DLC "shall be responsible" for certain acts and omissions, (*i.e.*, those of DLC, its agents, and its subcontractors), but the section does not say DLC is responsible for Hughes' acts or omissions (*e.g.*, Hughes' defective work). (*Id.* at 66.) Second, in Section 3.5.1, DLC warrants its work "will be free from defects" and "excludes" from its warranty "remedy for damage or defect caused by […] alterations to the Work not executed by" DLC. (*Id.* at 67.) So, DLC explicitly did not promise it will remedy "damage or defect caused by" work of others, *e.g.*, Hughes' work. (*See id.*) Third, Section 3.18.1 provides DLC "shall indemnify" certain parties for "damages" "only to the extent" the damages were "caused by" DLC, its subcontractors, and its employees. (*Id.* at 71.)

9

Because Plaintiffs now assert Hughes' work caused property damage and Hughes' work was independent of DLC's work, Section 3.18.1 does not require DLC to indemnify parties for Hughes' defective work. Finally, Section 6.2.3, which immediately follows the sole provision on which Plaintiffs rely, contemplates "costs […] incur[red] because of" Hughes' "defective construction" and provides Tibidabo, *not DLC*, "shall be responsible" for those costs. (*Id.* at 74.)

So, Plaintiffs have not established a written contractual provision makes DLC legally obligated to pay for damages caused by Hughes' defective work. Consequently, drawing all inferences in Plaintiffs' favor, Plaintiffs have not met their burden of alleging facts sufficient to support an inference the Policy covers alleged property damage caused by Hughes that occurred during the 2019-2020 policy period.

### B. "Tort" and "Equitable" Theories

In their oppositions, Plaintiffs vaguely assert "DLC's alleged liability was not based entirely on its contract with Tibidabo. Its alleged liability for 'property damage' was also based in tort and equitable claims." (Dkt. No. 45 at 11; *see* Dkt. No. 44 at 17.) Plaintiffs do not identify any "tort" or "equitable" theory, either in their Opposition briefs or at oral argument. Nor do Plaintiffs explain how DLC, a separate general contractor on the home construction project, could be liable in tort for Hughes' defective work, which was performed separately of DLC's work. (*See* Dkt. No. 37 ¶¶ 9-18 (alleging Hughes performed work prior to DLC's hiring as the general contractor, and all of Hughes' subsequent "remedial work" was performed "pursuant to the June 6, 2019 contract independent of [DLC's] work").) So, drawing inferences in Plaintiffs' favor, Plaintiffs' undefined "tort" or "equitable" theories do not establish DLC was legally obligated to pay for damages caused by Hughes' defective work.

### C. Other Arguments

At oral argument Plaintiffs referred to Hughes' indemnity demands to DLC and seemed to assume that because Hughes made the demands, DLC must be liable to Hughes and Defendant therefore had a duty to indemnify. But for the duty to indemnify the question is whether the insurance policy covers the claim, *see MacKinnon*, 31 Cal. 4th at 648, and here, as in all liability claims, the policy only covers what the insured is "legally obligated to pay." (Dkt. No. 37-8 at

10

18.) So, Hughes' demand for indemnity, unaccompanied by a contractual provision requiring said indemnity, does not impose upon DLC a legal obligation to pay the indemnity demand. *See AIU Ins.*, 51 Cal. 3d at 821–22 ("the mutual intention of the parties at the time the contract is formed governs interpretation. Such intent is to be inferred, if possible, **solely** from the written provisions of the contract.") (cleaned up) (emphasis added).

Plaintiffs also continually referred to Defendant's $1,000,000 payment under its 2020-2021 primary policy as an admission it had a duty to pay under the Policy. But Plaintiffs cite no authority holding such a voluntary payment is an admission that means, notwithstanding policy language, the insurer is liable. And at oral argument, Plaintiffs disavowed making that argument or any estoppel argument.

So, drawing all inferences in Plaintiffs' favor, Plaintiffs have not met their burden of showing the Policy covered property damage caused by Hughes that occurred during the policy period. Defendant's motions to dismiss therefore must be granted.

## CONCLUSION

As the Court explained in its Order dismissing the original complaints, Defendant has met its burden of proving as a matter of law Policy exclusion j(5) applies to all damage caused by DLC and/or its subcontractors. (Dkt. No. 34.) And, as explained above, the Policy does not apply as a matter of law to damage caused by Hughes' work. So, the Court grants Defendant's motions to dismiss. As Plaintiffs previously amended their claims, and further amendment would be futile, dismissal is without leave to amend.

This Order disposes of Docket Nos. 39 and 40.

**IT IS SO ORDERED.**

Dated: June 8, 2026

JACQUELINE SCOTT CORLEY
United States District Judge